With that said, then we'll move to the first argument of the morning, which is Cato Capital v. Hemispherx. And now, to Mr. Reid. May it please the court, John Reid from the Delaware office of DLA Piper on behalf of the appellant, Cato Capital. Also at council table with me is Henry DuPont Ridgely, who's also in our Delaware office. If it's all right, I'd like to reserve three minutes for rebuttal. Granted. Thank you. This appeal involves the interpretation of a few sentences in an investment banking contract between Cato and the appellee, Hemispherx. Did Cato draft the original agreement, this document, though I know it was modified to some extent? Was it a template that was created by Cato? It's my understanding. I was not trial counsel. I have that little bit of a disadvantage. But it's my understanding that it was a template that in fact was used. And that language is in the investment banking industry. But it's language that you provided, isn't it? Yes. The critical parts. It's a critical document. Absolutely. Good. We ask that this court reverse the district court for two reasons. One, the district court read into the contract a causation requirement that is specifically contradicted by the express currency. It not only did that, the district court said that in particular with respect to the language, whatever it is that the district court finds brings about a causation requirement, was unambiguous. Right? Yes. We agree with that. You agree it's unambiguous that there's a causation requirement? Well, we agree that the contract's unambiguous. What we agree is that there's no causation requirement. Oh. Isn't the causation requirement secondary? That was a secondary argument for the court's ruling. But it's critical that we win on both issues. Yes. So, if it's all right with the court, I was going to start with that issue first. With the causation requirement? Yes. Because it's the easiest one to address. Well, I'd like to start the other way, if you don't mind. I will start in whatever order the court would like. It's just that the causation argument, I'm going to walk through the contract and chronologically. Well, let us help you walk. Thank you. Okay? So, here's what I'd like you to talk about. So, we have 2B and 2C. If I understand your argument on substantial compliance, the different iterations of the 2C list, from your perspective, comply with 2B. Is that correct? Yes. So, what we're actually saying, there's a lot of talk in the briefs about a so-called 2B and a 2C list. And I would submit to the court that there really is only one list that matters. So, the agreement doesn't say that. I mean, the agreement has two separate provisions, as Judge Greenaway indicated, B and C. And, temporarily, they suggest that separate lists need to be provided, don't they? Well, temporarily. Temporarily, what they contemplate, it depends on what you're defining as the list of Cato prospects. Well, can't you agree or disagree with that? I mean, C says you will immediately provide, right, and B says at the end of the agreement. Temporarily, those are distinct. Yes, and this is the distinction I'm making. Where it says we will immediately provide, that is not, in fact, a list of Cato prospects. The Cato prospects is a defined term, and it's in Section 2C. And so, what you're supposed to do is you send the list of prospects. Once they are, in fact, approved, then that becomes the list of prospects, and that gets appended to the agreement. And so, and that's all under 2C. So, the way we read this contract is there's really only one sort of defined list of Cato prospects. Section 2C tells us how it comes into existence. Section 2B tells us what the importance of it is with regard to whether or not we're entitled to a fee or not. All right, but you wouldn't argue that everyone on 2C is automatically on 2B, right? I mean, that just doesn't make sense in your business. Well, again, Your Honor, what I would argue is that everyone that would be on a preliminary list that you would provide to Hemispherics. And that's the 2C list when you say preliminary. I say, okay. That's at the time of the execution of the agreement or around the time of the execution. Right. That's the beginning of, that is the, at the, called for by the opening paragraphs of Section 2C. But we're still within 2C, because once they approve it, then those that are approved become part of the list of Cato prospects. And that is also spelled out within Part of, but during the course of the agreement, and in this case a four-month period of time, it is both possible and likely that certain prospects will fall by the wayside and other prospects will be developed by Cato. Correct. Right? That is correct. And that's what happened. Right. So we are necessarily talking about the need for two separate lists, huh? Well, we're talking about a need to perhaps update what is the official list of Cato prospects. That I agree. Yeah, but an update confuses the issue here, because it's clear that there were updates of the 2C list. And if I understand your argument, your argument is the 2C list in its various iterations satisfies the 2B requirement, when in fact, at best, 2B is a subset, or actually, right, 2B at best is a mirror of 2C, but more likely it's a subset of 2C. Yeah. And, you know, one can't satisfy both. I would respectfully disagree with the way that you presented that, because what I would say is, yes, there were subsequent lists of people we wanted to have proposed. But they do not become part of the list that gets appended to the agreement until Hemispherics reviews them and approves. And on the record here, there is no doubt that of the three, over 20 prospects were ultimately provided to Hemispherics. Of the three that ultimately invested, all of them were provided and approved within one week of the effective date of this contract. But that doesn't work. And they became appended to the contract. But in the absence of the provision of a 2B list, what are we to make of that? Your Honor, I think what you're to make of that is exactly what the contract says. And what the contract says under 2C is, once they approve, that becomes the list of Cato prospects. Then you go to 2B. And this is what 2B says. 2B says, Cato will only be entitled to placement fees for transactions during the tail period completed with any of the listed Cato prospects or their affiliates. Well, listed Cato prospects is a defined term. And that was set in stone as of November 30th, at least with regard to the three investors here that ultimately invested. And they remained on the list all the way through to the end. But you've ignored the portion that says, at the end of the term of this agreement, Cato shall designate in writing to the company all Cato prospects. Yes, well, Your Honor. So temporarily, something has to happen at the end that differs from what happens at the beginning. I didn't mean to ignore it, Your Honor. It's not in the same sentence. It is the sentence that precedes the sentence that I just read. And so if you were to stop at the sentence that I previously read, you would say, these entities are on the list. A transaction was made with these entities within the parameters of the contract. They're entitled to a fee. This is where we believe the district court went wrong. But you said if we stop there, aren't we supposed to read the contract in its entirety? I agree. You can't stop there. And this is where I think the district court went wrong. The district court read the sentence that said, at the end of the term of this agreement, Cato shall designate in writing to the company all Cato prospects. And it read that as having a purely temporal requirement. And the district court, though, actually made other findings with regard to the purpose of that. The district court made two important findings. That is, one, that the purpose of that list was to put hemispherics on notice of the list of Cato prospects. That's undisputed. We know what that was. And the second purpose was so that they would know what their obligations were when they got to the end of the contract. So it is a provision, the import of which redounds to the benefit of both parties, right? Yes. So that's exactly right, Your Honor. The importance is, I mean, you could change one word in the contract. You could change at to buy. But as the court found the expectation under that contract was so that by the time the parties got to the end of the contract, hemispherics would have a written list of its prospects so that in the tail period when they're not around anymore, they can't come back later and say, oh, that was a prospect we identified. It must be given to them in writing. Did your client give a letter or a notice or a correspondence that complies with 2B? Your Honor, we gave. On January 5th, it's around page 120 or 118 of the record. There's only a few relevant emails in the record. We're back to the temporal question of Judge Smith's, right? Temporally, right? That's not at the end of the agreement. Well, so this is the question. Is this the updated agreement? Yes. So is it your position that becomes the functional equivalent of what is required by 2B? Well, yes. It is. Which of the updates is the functional equivalent? Because there was more than one. Well, there was January 5th in which we provided some additional potential investors that they approved, but they're irrelevant because they didn't invest. Okay, so that's not an update. No. In response to that, they asked us for our full list updated, and that's what we provided. And we sent it, and we said, this is the investor list. In talking about the expectations so that when they get to the end of the contract, they'll know what their expectations are, the record couldn't be clearer on this. The response we got back from that email of the full list updated was that they wanted to negotiate our, quote, fees as agreed. If there was any doubt about what they thought their obligations were under the contract as of that time, it was completely resolved by our response on the same day in which we said very clearly, we're not giving up on this. We made the contacts, and we even got one offer from Iroquois. So here's the problem with it, the way that the district court interpreted it. As a purely temporal, as opposed to looking at what the contract expectations are, is a week too early? Two weeks too early? Does this all simply boil down to you're implicitly conceding that you did not adhere strictly to the requirements of 2B and 2C, but that to the extent you did not, any breach, if you will, is not material? Obviously, if the contract said we had to do it on the last day, and we think that's an unreasonable interpretation, we didn't do that. We think the reasonable interpretation is a basic tenet of contract law, that you don't interpret contracts that would work in unjust forfeiture if there's another interpretation. And the lack of injustice here is simply that you're saying there was no prejudice to hemispherics because they knew already? Is that what you're suggesting? Yes, I'm about to run into my rebuttal time, but let me do it, if it's all right with the court. Yeah, that's all right. Once they're on notice, I don't want to be flippant about this, but how do you get unnoticed seven weeks later to the extent there is such a term? It wasn't written in disappearing ink. It wasn't rescinded or revoked. They had the list. They actually acknowledged we're entitled to our fees as agreed, only they tried to negotiate them, and we told them no. So if the purpose is, as the court found, that they need to know at the end of the contract what their obligations are, they knew. They knew that they thought we were entitled to a fee, and they knew that we were not giving up on what we were entitled to under the contract. The record's clear on that. And the way this is interpreted is a hyper-technical way to say that on the very last day we had to give them another list, and that list would not have contained anything new. How is it hyper-technical to say that's what the agreement says explicitly? Why is that hyper-technical? Well, because it works an unjust forfeiture, and that is not the way it works. How is that an unjust forfeiture? How is that an unjust forfeiture? We start with the notion it's your agreement. I understand that it's negotiated. We have to give effect to two different clauses. We've established that there's a temporal difference between B and C. One requires immediate provision of a list, and the other requires one at the end of the agreement. Are we to read the agreement as to not require something at the end of the agreement, as is suggested by B? What I'm suggesting is that you try to harmonize the contract to satisfy the party's expectations. And the notion that having performed all the services that you performed, and then being aware of it and acknowledging it, that somehow on the very last day you were to show up and just reconfirm that you're entitled to something under the contract when they already know what you're entitled to under the contract seems to be an unreasonable interpretation. As I said, you could read the contract to say at the end of the term of the agreement, Cato shall have designated, as opposed to shall designate. Because the point is you want them to know what their obligations are when they get to the end of the contract. How could they not know that when they had notice and they had the list, and we never rescinded it and never updated it? That's why we didn't send the other list. What do they know? They know that you've provided them pursuant to C a list of everyone you can think of, everyone that you contemplated getting in touch with. Now, that list is not necessarily a mirror of what complies with B. Why would they know? I respectfully disagree. Once you follow the C process and it gets appended to the agreement, that is the list. So we have to read out of existence B, then. That's what you're saying? Read out of existence B. It doesn't read it out of existence. The intent of B is to make sure, to the extent it hasn't already been done, that when all the parties get to the end of the contract, they know what the list is. They knew what the list was when they got to the end of the contract. All right. We'll have you. One more. Yes. All right. Thank you. Thank you. Why would you not know? Right? I've complied with C. And in every instance that I'm proposing to you, I've complied with C. That would mean that in every instance that a list is complied with C, I would know so that B becomes superfluous. I respectfully disagree. Give me an example of when you wouldn't know if you've been provided a list pursuant to C. If, in fact, it was on a list that had been approved, that's correct. There would not be a circumstance when you would get to the end of the term that you wouldn't know. The point of that was to make sure that they had in writing, which is the list, they had in writing a list of all of our prospects so that it prevents us during the tail period when somebody invests coming back and saying, we're responsible. We made that contact. Here's the email. Here's the email we sent to you telling you. And it's to make sure that there's no dispute about this, that they have in writing from us a full list of our prospects. Okay, so B under that interpretation is superfluous. No, it's not superfluous. As a matter of fact. When is it not superfluous? In the intent of it. When is it not superfluous? Well, because the intent of it is satisfied so that when the parties get to the end of the contract, Hemispherics has the full list in writing. They just happen to have it seven weeks early here. Okay. That's our argument. Thank you. That was three. All right. Thank you. Thank you very much. We'll have you back on rebuttal. Mr. Black. Thank you, Your Honor. May it please the Court. James Black of Black & Grimrose, Philadelphia, on behalf of Hemispherics BioPharma. Your Honor, the findings of fact of the lower court are comprehensive, and I think it is important to set forth that this is an appeal from a three-day trial in which the court carefully evaluated the witnesses and made factual determinations as to whether or not there had been substantial compliance with the requirement of two lists. So I take it then you are not asserting that the latter list, the 2B list, is a condition precedent. Correct? We do believe that it is a condition preceding to payment. And what is the language that you point to in order for us to view that as a condition that needs to be satisfied to payment? It doesn't say provided that there is a list. No, it says. It doesn't say on the condition of providing a list. And so does that mean it's more like a promise rather than a condition? Under some states' law, that would be true. Under Delaware law, as the court carefully enunciated, no specific word, unlike Pennsylvania law, for example, is necessary in order to create a condition precedent. The words CATO will only be entitled to placement fees for transactions completed with any of the listed CATO prospects create the requisite condition precedent. It indicates that payment will not be made unless that condition is met. Which list? Obviously, I'm reading from 2B, which is the list that it says, at the end of the term of this agreement, CATO shall designate in writing. Yeah, but it doesn't say a list. But somehow a list does appear in C. Yes, and this is not a model of drafting. It is certainly not a model of drafting because even temporarily what's happening, 2C is referring to something that happens before 2B. That's conceded. However, these lists, and the court was very carefully enunciated, both what the facts showed and what the structure of this was agreed to by the parties, is that these lists served entirely different purposes. One was to give CATO authority to contact. This is a non-exclusive contract. I think I should say that. And that makes this different from every other kind of almost every case. Do you think that's unusual in this setting with these sorts of agreements? Say it again. Do you know if that is unusual? That is, that it's not an exclusive agreement. In this particular type of transaction, in this market. I would say that it is unusual because every single case that is cited by CATO and every case, almost every case that is cited that we have found on these various issues of whether it be substantial compliance or waiver or causation, all deal with the courts of other jurisdictions pointing to the fact that if you're on notice that your broker, whether it's a real estate broker or investment broker. Well, in fact, most of the cases are broker cases. But if you're on notice that they have participated when you have engaged them exclusively, then there are certain circumstances by which you're on notice that technical compliance, you can't argue later that you didn't know that you were going to be entitled because they were exclusive. In an exclusive contract, the parties have already made the causation determination when they enter into the contract. They've said, you are my financial advisor, real estate broker, whatever the case may be. And anything that happens as a result of this will be attributed to your services. Let me ask you a question. If the January list, which complies with 2C, had been provided to you at the end of the agreement, same list, but it says end of agreement list, do we have a problem? Do we have a problem? We would have a much different case because tooth And the court made a specific finding below as to why that was prejudicial, not having a list at the end of the term that indicated to Hemispherics that it intended or that it expected to be paid. When the ultimate transaction occurred, another investment banker, under completely different circumstances, brings a completely different type of transaction. Cato was working on what was essentially a mortgage on the FDA facility. As a result of the swine flu pandemic, months later, Hemispherics products became extremely important. They were adjudicates to Well, that just tells us that there was sort of a more active interest by the investment community, but I don't think that's really what Judge Graham is focused on. The court made a specific finding that Hemispherics was robbed of its ability to say to Rodman and Renshaw, the subsequent broker, you can't use these brokers. We did not even know who they were going to contact or who they were bringing to us. We were severely prejudiced, and we were trapped, essentially, by never having gotten a list that indicated that Cato intended to be paid. Okay, so, Rob, you say robbed, right? Never mind. Here's the question. So, if you got the January list at the end of the agreement, right, and it said, here's your 2B list, now you have actual notice. We've been talking about actual notice. It's alluded to, obviously, in the district court opinion. At that point in time, your adversary is arguing, hey, you knew all these names. You knew what was going on, okay? The list that was provided in January essentially complies with 2B. What's the difference between getting that list in January, which provides you a list of names, and getting the same list at the end of the agreement? Two things. Providing the exact same names. Two things. First of all, they would not, I don't believe, have contained the same names because there were, and this was put into the record, there were approved contacts that they never contacted. So, they wouldn't have just given us their different lists. But we would have had two opportunities. One is the one that the district court found as a fact, which is that Dr. Carter, the CEO, when approached about a transaction and checked to see whether he had any obligations, would have been able to say to Rodman and Renshaw, you can go ahead with your plan, but here's a list of people that you cannot have invest in this. We would have been able to protect ourselves from this trap. Secondly, and this is not found by the district court, but obviously, if we had gotten a list where they said they expected to be paid from every single person there, we could have gone back to them and said, I thought you said there was nothing going on, that everything is dead. We were looking for money. If Cato had caused the transaction, we would have paid them. We paid Rodman and Renshaw within days of them bringing investment funds into this biopharmaceutical company. So, we were prejudiced in two ways. So, your argument is that 2C can't be substituted or argued that it's 2B because everyone on 2C couldn't have satisfied the introduced requirement? Absolutely correct. We would have had an opportunity to contest it then, and we would have had an opportunity to protect ourselves later when the ultimate transaction occurred. In order to write out the 2B list, the list that the court found was a condition proceeding, in order to write that out, you have to just simply redline that provision. You have to redline, blue line, X out an entire provision of this contract. So, your argument is it's a condition proceeding. But even if it's not a condition proceeding, there was no substantial compliance? Absolutely not substantial compliance. And the court made a finding of that both from the Cato side, where the court cited the evidence that when Cato supplied that list, it was not intending to comply with 2B, and also looked at it from the hemispheric side. And there were four findings of the district court that are unchallenged as to why it believed, why it found from the evidence that no substantial compliance had occurred. And one of them is you're saying that there was testimony from someone on the Cato side saying, You know, I didn't, we knew we had a list obligation. We didn't submit it. Correct. And the court cited the following. In fact, at the time that Pambianchi asked for the full left updated, it was, first of all, it was a third, less than a third of the way into the active period of the contract. No one was contemplating tail periods at this point. Everyone was trying to work on getting money during the active period. But the court cited four factors. The fact that the time that Pambianchi requested your full list updated, the approvals had been spread over a list and e-mails and subsequent e-mails. So he was consolidating who it was they were contacting. Cato's communication with that list referred to the updated investor list. They made no mention of having provided the list to apprise hemispherics of investors for which Cato expected to receive payment should a transaction occur. There was no credible evidence that the updated list sent by Cato was sent with compensation during the tail period in mind by either side. And when Cato later demanded payment in May of 2009, it made no mention of having supplied or complied with a list under 2B, but instead stated that Cato's provision of a list under paragraph 2C entitled it to payment. Let's talk about the second basis for the court's ruling, which is the causation requirement. In looking at the payment, the triggers for payment, the first trigger for payment is, quote, location of a source of capital. And then another trigger of payment is introducing an entity who ultimately constitutes a transaction. What more in the contract is required to trigger payment? Assume for the purposes of this question that list was sent. There has to be some scintilla of relationship. Relationship? That's your conclusion. What is the language in the contract that points to that? Because Judge Schwartz has just fixed on two specific terms, neither of which are defined in the agreement. Okay. Locates that appears in 2A, introduced that appears in 2C. The court below cited that the first paragraph of the contract refers to the purpose of the contract that Cato facilitate debt and equity financials, and cited to Webster's definition of what it means to facilitate, which is to cause or to bring about. Well, why isn't just introducing that is make known to someone, as in your client, of a potential source of financing? Why isn't that sufficient? Well, among other things, you have to understand that, for example, with respect to Iroquois, they weren't introducing us to Iroquois. Iroquois knew hemispherics. Iroquois owned stock of hemispherics from a prior transaction at the time that they contacted Iroquois. Well, that assumes, and I don't know that anyone has gone to Mr. Webster on this question, but that assumes that introduce does not also include a situation where someone locates and then presents to an entity like hemispherics someone, an entity, that hemispherics already knows. Introduce may or may not preclude such a scenario. And I understand that, but I think this is not a contract for introduction. This is a contract for facilitating transactions and defines carefully, enunciates carefully the services that are expected, which, as the court below indicated, include screening and contacting investors, assisting in the negotiations, advising and assisting. This was not merely approaching. Yeah, but 2B says you don't need to, you don't have to perform any of those services. They're defined services and you still could get paid. So I don't think that that's really advancing. Well, there's two problems with that. Well, number one, 2B is, sorry, the paragraph in this contract that allows Cato to decide what level of services it should or should not provide. 2B clearly prevents hemispherics from charging Cato with not having done enough to get it money. Well, that's their good faith reasonable efforts language. I'm talking about the language that says all applicable fees shall be payable irrespective of any services rendered, services capital left to fine term, which you're just discussing. So they make clear, they give notice, doesn't matter if we make, we perform any of the services in paragraph one, we still can get paid. I agree that payment terms are different from service terms. Right, and the service terms cannot be, a paragraph of the service terms should not be read to completely obliterate the purpose of the contract that was that they were going to facilitate a debt or an equity offer.  Let's assume that we believe that Cato has complied with B, with the provision of the list in C. Just for a moment, let's assume that. So Iroquois, you may have known about them before, but you've now been provided with notice that we did an introduction, and the only, the language alluded to by Judge Schwartz is introduction. Wouldn't Cato then say, look, we gave you the notice, we complied with 2B, we introduced you, during the tail period you ran off and did this, we want to collect our fee. Why wouldn't we, as a court, look at that situation and say, you're right? Because, Your Honor, every case that has construed, in every jurisdiction, that has construed whether or not an introduction or service relates to a transaction, has put some level of causation between the activity and the result. But isn't, you've conceded, I believe, that most of those cases, both sides have referred to, are broker cases, right? Most are broker cases, correct. And many or most are real estate broker cases, aren't they? Right, which is a much easier determination. Which is factually a much different situation, where a broker will bring forth someone who does or does not meet the specific price sought by the owner, right? Once you've done that, there's an obligation to complete the transaction. Under those agreements, they're exclusive, they're one-list agreements. They only require two things. Let me ask you this about the causation issue. Exclusivity in the law. Let me ask you this about the causation issue. There are a few concepts in the law, more widely recognized, explicated, than causation. I grant you more in the tort area than in the contract area. But if causation is a requirement of this contract, wouldn't it be so simple to explicitly state a causation requirement, given that few things are so widely recognized within our jurisprudence? Your Honor, there's two things. You're correct. This is, in the tort context, almost looks like a strict liability type, where the minute you sign it, the minute you're on notice, that no causation would be necessary. That might make sense in an exclusive contract, and that's something that the parties commercially, two commercial parties, can deal with when they write their contract. In all the cases that were cited, not only was exclusivity cited as a key issue for why mere notice was enough, but the courts very carefully went to the language of the contract, which is much different than is what's here. What's here requires... I know I'm over the time, Judge Stroll. No, what's here requires... What all those contracts say is something to the effect of, and no matter what happens, and cite the cases, no matter what happens, we get paid. They're one-minth cases, they're exclusive cases, and their language is much different. The court found that in order to impose causation liability under this contract, some level, not a procuring clause, not a heightened level, but some level of nexus is required between the contacts or the services or the efforts of the broker that's seeking compensation. All right, we understand your position on that, then, Mr. Black. Mr. Reed, you have rebuttal. Thank you. Can I take about 30 seconds to deal with this causation argument? Because I think it is quite simple. Sections 1 and 2 of the contract actually talk about the services to be provided, use the words locate funding sources or identify funding sources. And as Judge Schwartz pointed out, Section 2B is very explicit, and it says if somebody invests that's on the list, regardless of the services provided, you get a fee. Also, the bottom of page 1 of the contract says what services are to be provided is in our sole discretion. So what I would suggest is what this contract is, we're the matchmaker. We're not the closer. That's what the language very clearly suggests. And to prevent them from being sort of amblered by somebody that they don't need us for, that's what the purpose of the approval is. If when we send them the list that has Iroquois and Hudson and Cranchire on it, it's very easy for them to say we don't need you. We already have somebody engaged in a dialogue with them. We're not going to approve. They approved, presumably because they needed us for the services that they retained us for. So I think that the language itself belies a causation requirement. What's the difference between location of a source of capital and introduce a third party who ultimately closes a transaction? So the language in the contract actually says either locate or identify. But what does that mean? It says Cato locates a source of capital for. Yes. Yes, so they could do that by just simply making an introduction. Now, the record, there is some evidence here that things, in fact, were done. Even at pages 7 to 9 of the court's opinion, the court talks about the things that were done. And, of course, our email, when they tried to renegotiate our fee, explained, wait a minute, one of the reasons we're not giving up on any fee that you agreed to pay us is because we did things. We made introductions. We arranged meetings. And in one case, we got a preliminary offer. So we did things. But if you read the contract, all we have to do is identify the source. What they do with it is up to them. Like I said, we're the matchmaker, not the closer. I think before I step down, I really want to address Judge Greenaway's question about the alleged superfluousness of the sentence in the middle of 2B. It's not really superfluous if you think about it as having the intent of making sure that we can't spring anybody on them after the end of the term that we haven't provided to them in writing on a list. So if you were to interpret this as a forfeiture, you would think that it would really be much clearer. And it would say something to the fact that notwithstanding all the other provisions or notwithstanding all the services provided, you must provide a final list. And it wouldn't say at the end. It would say something like within 30 days or within 10 days. It would be much more precise. And that's why I say to – and I agree, this contract was not – But you should have been more precise. The contract should have been more precise. And I suppose that rational people can easily say this contract is ambiguous. And I kind of think it is as well. But if you're going to say it's not and you're going to impose on it an interpretation that works a forfeiture, I respectfully submit that that is the wrong interpretation because there is a better and actually much more plausible interpretation, and that is the expectation is that when they get to the end of the contract, they'll know so that they can't be ambushed with somebody that's not on a list. They had it. Thank you. Thank you very much, Mr. Reed. Thank you, Mr. Black. Your arguments were very helpful in dealing with this highly problematic document.